**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | |
| | * | **CR. NO. 05-246-02** |
| | * | |
| | * | |
| **DAVID MORA-GIL** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**DEFENDANT MORA-GIL'S MEMORANDUM**
**IN SUPPORT OF DEFENDANTS MOTION TO DISMISS**
**AGGRAVATED IDENTITY THEFT COUNTS V,VI,VII & VIII OF THE INDICTMENT**

Defendant David Mora-Gil, through his attorney, Joanne Roney Hepworth, respectfully submits the following points and authorities in support of Defendants Motion To Dismiss Aggravated Identity Theft Count Of The Indictment.

**I.  RELEVANT FACTS.**

Defendants Contreras-Macedas, Mora-Gil, Francisco and Lopez-Vargas are each charged with one count of Aggravated Identity Theft, allegedly, because they possessed at least one illegal identity document, *e.g.,* a fraudulent social security card, employment authorization card or permanent resident card that contained an identifying number that belongs to a real person. Mr. Mora-Gil  is alleged to have possessed an identification document which bore his own name and contained the actual Social Security number of another individual.  The defendants deny any knowledge concerning the origins of the numbers on the cards or  that the numbers they allegedly used belonged to "another person". The Government  has proffered  no evidence that the defendants had any actual knowledge that the numbers on the cards were those  of any real person.   The original bill  in question, H.R. 1731, was titled the "Identity Theft Penalty Enhancement Act", and the statute, 18 USC 1028A, is captioned "Aggravated Identity Theft". The  legislative history states that its purpose  was to "provide enhanced penalties for persons who  steal  identities".  *United States v. Beachem,* 399 F.Supp. 1156 (W. D. Washington, 2005)(quoting, H.R. 1731, 108 H. Rpt. 528, H. Rep. P.L. 108-275, 2004).  The Statute reads:

" § 1028A.  **Aggravated identity theft**
(a) Offenses.
   (1) In general. Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."
(2) Terrorism offense. Whoever, during and in relation to any felony violation enumerated in section 2332b(g)(5)(B) [18 USCS § 2332b(g)(5)(B)], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person or a false identification document shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 5 years.

Defendant Cotreras-Mecedes, has moved for dismissal of the Aggravated Identity Theft  counts of the indictment or grounds of insufficient evidence of an essential element i.e the appropriate level of *scienter*.  Defendants Mora-Gil, Lopez-Vargas and Francisco have joined in the motion.

## II . ARGUMENT

### A.  The plain language of 18 U.S.C. § 1028A, its structure within the statutory scheme of 18 U.S.C. 1028 and 1028A, and the stated purpose of the act, necessarily require that "knowingly" applies to "a means of identification of another person"

Defendants submit that the only reasonable interpretation of the statute herein, consistent with the language, structure and purpose of the act, is that the word "knowingly" applies to "a means of identification of another person" and requires the government to prove that the defendants knew that the identifications they are accused of using belonged to another person. The plain language of 18 U.S.C. § 1028A, its structure within the statutory scheme of 18 U.S.C. 1028 and 1028A, and the stated purpose of the act, necessarily require that "knowingly" applies to "another person" and requires proof that the defendants knew that the identification in question belonged to another actual person in order to establish the requisite *mens rea* under the statute.

18 U.S.C. § 1028  penalizes "fraud and related activity in connection with identification documents, authentication features and information."  Section (a) sets out the forbidden conduct, section (b) sets out the penalties for these acts and section (c) provides definitions of terms in section (a).  Included in the forbidden conduct of section (a) includes (7)"knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person…"

section (b) enumerates the various penalties for varying degrees of the offenses.  To interpret 18 USC 1028A as doing nothing but adding a mandatory minimum penalty is absurd.  The congress need only to add a single category to section (b) to accomplish this goal.

Yet the Congress held hearings, debated and enacted  a separate statute 18 U.S.C. § 1028A specifically in response to what it saw as a deficiency in the current law which did not address the growing problem of "identity theft".  The repeatedly stated purpose of the act is to  " …create new criminal penalties for knowingly possessing another person's means of identification and would increase the criminal fines for other acts of identity theft." H.R. Rep. 108 H. Rpt. 528, H. Rep. P.L. 108-275. " The Committee states that pursuant to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, H.R.1731, is intended to reduce the incidence of identity theft and fraud and address the most serious criminals by providing stronger penalties for those who would commit such crimes in furtherance of other more serious crimes." Id.

"Purpose and Summary -"H.R. 1731, the "Identity Theft Penalty Enhancement Act," addresses the growing problem of identity theft. Currently under 18 U.S.C. Section(s) 1028 many identity thieves receive short terms of imprisonment or probation; after their release, many of these thieves will go on to use false identities to commit much more serious crimes. H.R. 1731 provides enhanced penalties for persons who steal identities to commit terrorist acts, immigration violations, firearms offenses, and other serious crimes. The bill also amends current law to impose a higher maximum penalty for identity theft used to facilitate acts of terrorism."    H.R. Rep. 108 H. Rpt. 528, H. Rep. P.L. 108-275.

The stated purpose of the act was to combat and deter identity theft.  Identity theft implies a knowledge that the identification used was that of another person and was stolen from that person. Therefore the plain language, the structure and the purpose of 18 U.S.C 1028A all militate in favor of the interpretation that "knowingly" is intended to apply to "a means of identification of another person" and requires the government to prove that the defendants knew that the identifications they are accused of using belonged to another person.

Two United States District Courts have addressed this issue of interpretation of 18 U.S.C. 1028A with conflicting results.  In *United States v. Montejo,* the District Court for the Eastern District of Virginia held that the ordinary meaning of the plain language of the statute and  the

last antecedent rule  preempted the legislative history, the title of the statute and the "odd result" of a two year sentence plus deportation for the defendant and thus did not require that the defendant have known that identification actually belonged to another person.  353 F. Supp.2d 643  (E.D. VA. 2005).[1]  Conversely, a District Court in the Western District of Washington ruled that " in order to justify the additional two years' imprisonment for Defendant that the United States is seeking under the statute, the United States must provide proof that [defendant] had knowledge that the identification she used belonged to another person. In reaching this decision, this Court  was also persuaded by the facts that the title of 18 U.S.C. § 1028A is "Aggravated Identity Theft" and that the legislative history of the statute speaks directly about, "provid[ing] enhanced penalties for persons who *steal* identities. . ." H.R. Rep. 108-528 at 3, 2004 (emphasis added)." *United States v.Beachem*, 399 F.Supp.2d. 1156 (W.D. WA. 2005).

**B.     The legislative history of the Act, H.R. 1731 clearly shows the intent of the Congress to address the growing problem of identity theft and  increase penalties for "knowingly possessing another person's means of identification".**

The following excerpt from the legislative history of H.R. 1731, clearly illustrates the purpose of the legislation and leaves little doubt the emphasis intended by Congress.

Background and Need for the Legislation

The terms "identity theft" and "identity fraud" refer to all types of crimes in which someone wrongfully obtains and uses another person's personal data in some way that involves fraud or deception, typically for economic or other gain, including immigration benefits. The Federal Trade Commission ("FTC") received 161,819 victim complaints of someone using another's information in 2002. Of these, 22% involved more than one type of identity crime.

For 2002, the FTC breakdown of types of identity theft shows that 42% of complaints involved credit card fraud, 22% involved the activation of a utility in the victim's name, 17% involved bank accounts opened in the victim's name, 9% involved employment fraud, 8% involved government documents or benefits fraud, 6% involved consumer loans or mortgages obtained in the victim's name, and 16% involved medical, bankruptcy, securities and other miscellaneous fraud.

In 2003, the FTC randomly sampled households. A total of 4.6 % of survey participants

[1] The *Montejo* decision is currently on appeal to the Fourth Circuit, with oral argument recently heard on October 28, 2005. *See United States v. Montejo,* No. 05-4143 (4th Cir. 2005).

4

indicated that they had discovered they were victims of some type of identity theft in the past year. This result suggests that almost 10 million Americans were the victims of some form of identity theft within the last year, which means despite all the attention to this type of crime since September 11, 2001 the incidence of this crime is increasing.

As international cooperation increases to combat terrorism, al-Qaida and other terrorist organizations increasingly turn to stolen identities to hide themselves from law enforcement. For example, according to testimony by Jim Huse, Inspector General of the Social Security Administration before a 2002 joint hearing of two Subcommittees of this Committee, five Social Security numbers associated with some of the terrorists appeared to be counterfeit and were never issued by the Social Security Administration, one was assigned to a child, and four of the terrorists were associated with multiple Social Security numbers. An FBI agent testified at the same hearing, "terrorists have long utilized identity theft as well as Social Security number fraud to enable them to obtain such things as cover employment and access to secure locations. These and similar means can be utilized by terrorists to obtain driver's licenses, and bank and credit card accounts, through which terrorism is facilitated."

Since September 11, 2001, Federal and State officials have taken notice of this crime because of the potential threat to security, but the cost to the consumer and corporations is equally alarming. The FTC estimates the loss to businesses and financial institutions from identity theft to be $47.6 billion. The costs to individual consumers are estimated to be approximately $5.0 billion.

As this crime increases, we must try to find new ways to combat it. Websites developed by the FTC and consumer groups encourage consumers to protect themselves by shredding mail and keeping a close watch over their credit reports; yet, the FTC's statistics suggest that identity thieves are obtaining individuals' personal information for misuse not only through "dumpster diving," but also through accessing information that was originally collected for an authorized purpose. The information is accessed either by employees of the company or of a third party that is authorized to access the accounts in the normal course of business, or by outside individuals who hack into computers or steal paperwork likely to contain personal information.

In one such case, the Justice Department charged a 33-year-old customer service representative from Long Island, New York, with identity theft and fraud for using his position at a company that provided computer software and hardware to banks and lending companies to access personal consumer credit information from three credit reporting agencies. The scheme allowed him to access the personal information of over 30,000 victims.

The insider threat from identity theft and identity fraud is a threat to personal security as well as national security. The United States Attorney in Atlanta charged 28 people with participating in a fraud ring that supplied over 1,900 individuals with fraudulent Social Security cards. The cards were supplied by a Social Security Administration clerk in

exchange for $70,000 in payoffs.

Under current law, many perpetrators of identity theft receive little or no prison time. That has become a tacit encouragement to those arrested to continue to pursue such crimes. The following are examples of instances in which persons involved in identity theft received little or no prison time:

U. S. v. Amry. On October 15, 2003, Mohamed Amry, a former employee of a Bally's Health Club in Cambridge, Massachusetts, pleaded guilty to a multi-count indictment charging him with conspiracy to commit bank fraud (18 U.S.C. Section(s) 371), bank fraud (18 U.S.C. Section(s) 1344), conspiracy to commit access device fraud and access device fraud (18 U.S.C. Section(s) 1029), and conspiracy to commit identity theft (18 U.S.C. Section(s) 1028). Amry, using a skimmer to obtain credit-card data from members of the health club, provided stolen names, Social Security numbers, and credit-card information of at least 30 people to Abdelghani Meskini, who pleaded guilty to conspiracy in connection with the plot to blow up Los Angeles International Airport in 1999. Using victims' names, Amry reportedly assisted Meskini in creating false green cards and Social Security cards. Meskini used the information to open bank accounts in New York, where he deposited counterfeit checks. Amry was not charged with knowledge of the terrorists' intentions in obtaining and using the stolen identities. On January 17, 2003, Amry was sentenced to 15 months imprisonment.

U. S. v. Scheller. Suzanne M. Scheller was a financial institution employee. Scheller accessed the financial institution's computer system and searched for potential customers for a friend who was starting a real estate business. After identifying prospects, Scheller then provided the friend with the customer account information. Scheller admitted that she knew her unauthorized access was against the policy of the financial institution. The investigation established that some of the information provided by Scheller was actually used by another individual unknown to her as part of an identity theft scheme. Imposters used the customer account information to steal the identity of the customers and conduct transactions at the financial institution. Scheller pleaded guilty to one count of obtaining unauthorized computer access to customer account information from a financial institution, in violation of 18 U.S.C. Section(s) 2, 1030(a)(2)(A), 1030(c)(2)(B)(i), 1030(c)(2)(B)(iii). On November 30, 2001, Scheller was sentenced to 36 months probation.

U. S. v. Opara. On February 7, 2002, Chuck Opara, after having pleaded guilty to multiple counts of submitting false claims and identity theft, was sentenced to 15 months imprisonment. According to court documents filed in this case, Opara engaged in a multi-million dollar fraud scheme. As part of the scheme, Opara stole the identities of 24 people, and he submitted bogus Federal income tax returns for those people that sought average refunds of $50,000. The fraudulent tax returns asked that refunds be mailed to two dozen mail-drops that Opara had acquired.

U. S. v. Maxfield. On five separate occasions between 1996 and 1998, William K.

6

Maxfield used the Social Security number of a William E. Maxfield (no relation) to obtain loans and lines of credit. He was able to obtain the false Social Security number through his employment at an auto dealership. Maxfield defaulted on some of the loans but was timely on others. Ultimately, most of the lenders were paid; however, the more significant injury was to William E. Maxfield, who suffered harm to his credit rating and had great difficulty in clearing what appeared to be delinquent accounts. On January 9, 2003, William K. Maxfield was sentenced to 10 months imprisonment.

U. S. v. Rodriguez. While receiving Title II disability benefits, Dolores Rodriguez worked as a science teacher at a school under her husband's Social Security number. She received over $80,000 in disability benefits. She pled guilty to a violation of 18 U.S.C. Section(s) 641. She was sentenced to 12 months home confinement, 5 years probation, and restitution.

U. S. v. Fergerson. Diana Fergerson had stolen the identity of another person years earlier. She used the stolen identity to apply for and receive Social Security benefits. She also used the stolen identity to establish credit. She received over $45,000 in Social Security disability benefits. She pled guilty to several charges including violations of 18 U.S.C. Section(s) 641 and 18 U.S.C. Section(s) 1028(a)(7). She was sentenced to 5 years probation and restitution.

U. S. v. Benavides-Holguin. Porfirio Benavides-Holguin, a resident of Chihuahua, Mexico, received Title XVI benefits under the name and Social Security number of his former brother-in-law, a U.S. citizen. He pled guilty to both counts of a 2 count indictment alleging violations of 42 U.S.C. Section(s) 1383(a)(2). He was sentenced to 10 months confinement, 3 years of non-reporting supervised release, and restitution.

U. S. v. Green-Jones. Arnetta Green-Jones received SSI benefits under her actual Social Security number while working as a seasonal temporary worker employed by the IRS using the Social Security number of another individual. She pled guilty to a violation of 42 U.S.C. Section(s) 408(a)(7)(B), 42 U.S.C. Section(s) 1383a(a)(3)(A) and 18 U.S.C. Section(s) 1028(a)(4). She was ordered to serve 5 years probation and pay restitution. H.R. 1731, 108 H. Rpt. 528. H. Rep.-P.L. 108-275.

In each and every instances related above the targeted perpetrator was an actual identity thief who would have easily been proven to have known that the identifications with which they were charged belonged to another person. In light of this clear stated background and purpose, the only logical interpretation of the plain language of the statute would require some level of criminal culpability for the theft of "another persons" identity.

**C. Accepted rules of statutory interpretation in this jurisdiction permit the "knowingly" to apply to "another persons" identity.**

The D.C. Circuit has approved the reasonable interpretation of penal statutes by the unrestricted application of qualifying words to succeeding sections of a statute where the sense of the entire act so requires. "Where the sense of the entire act requires the qualifying word or phrase to apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent. This explication of the last antecedent rule makes quite clear that the court is dealing not with a hard-and-fast rule, but rather an aid to discovery of intent that applies only where no contrary intention appears. The last antecedent rule is just one of several "tools" that a court may use in interpreting a statute. It does not prohibit the court from examining the statute's purpose, nor does it lessen the court's role in mediating tensions between a statute's text and purpose." *United States v. Nofziger*, 878 F.2d 442, 460 (D.C. Cir. 1989). Supreme Court precedent has held that a statute's qualifiers could be read to modify words to which they were not necessarily adjacent, in order to provide an appropriate level of scienter to justify a punishment under the Constitution. *See United States v. X-citement Video, Inc.,* 513 U.S. 64, 79, 115 S. Ct. 464, 130 L. Ed. 2d 372 *(1994)*

When an interpreted meaning has led to absurd or futile results, the Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' the Court has followed that purpose, rather than the literal words.' *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). And see *Rathbun v. United States,* 355 U.S. 107, 109, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). *Shaffer v. Singh,* 120 U.S. App. D.C. 42 (D.C. Cir. 1965)

Based on the foregoing, the Court must rule that "knowingly" applies to "another person" as both terms are used in 18 U.S.C. § 1028A (a)(1) and requires a finding that the defendants knew that the identifications in question belonged to another actual person at the time she committed the offense in order to establish the requisite *mens rea* under the statute.

    **D.**      **Under The Due Process Clause Of The Fifth Amendment And The Notice And Jury Trial Guarantees Of The Sixth Amendment, Any Fact That Increases The Maximum Penalty For A Crime Must Be Charged In An Indictment, Submitted To A Jury And Proven Beyond A Reasonable Doubt.**

In the instant statute the fact that the identification was that of another person must be considered an element of the offense and as an element it must have some *mens rea* attached . Therefore the government must prove that the defendants knew the identification numbers belonged to "another person" beyond a reasonable doubt. *Apprendi v. New Jersey,* 120 S.Ct 2348, 2355.

**III.**    **REPLY TO THE GOVERNMENT'S OPPOSITION**

"The government contends that it must prove only that the defendants knowingly possessed the illegal identity document which contained an identifying number that belonged to a real person. Stated another way, in the government's view, the defendants are guilty of Aggravated Identity Theft even if they did not know that the identifying number belonged to a real person, as long as they knew they possessed a fraudulent identity document." Government's Opposition, p.2. To support its position the Government cites *United States v. Montejo*, 353 F. Supp. 2d 643 (E.D. Va. 2005).

  **A. The Reliance On *Montejo*'s Tortured Logic Is Misplaced And Ignores The Purpose And Legislative Intent Of The 18 USC 1028A.**

The Government relies heavily on the district court opinion  from Norfolk Virginia, *United States v. Montejo*...  "The plain language of the operative clause in this statute clearly shows that "knowingly" modifies "transfers, possesses, or uses," and not the more distant phrase "means of identification of another." In discussing the plain language of § 1028A(a)(1) <u>Montejo</u> observed, "[o]rdinarily, qualifying words apply only to their immediate antecedent." <u>Montejo,</u> at 648 (citing      <u>Nat'l Coalition</u> <u>for Students with Disabilities Educ. and Legal Def. Fund v. Allen,</u> 152 F.3d 283, 288 n.6 (4th Cir. 1998) and 2A Sutherland Statutory Construction § 47.33 (5th ed. 1992)). Therefore, under the plain reading of § 1028A(a)(1), the defendants in this case can be convicted if the government proves they knowingly possessed fake documents, even if they were not aware the "means of identification" belonged to another person." Government's Opposition, p. 3.

9

**B.    Both the D.C. Circuit and the Supreme Court  Have Recognized a More Flexible Approach to Statutory Interpretation.**

As stated above, this slavish adherence to the rule of antecedence is not called for in the face of a clearly opposite legislative intent  and an absurd result.[2]    The rule of statutory construction so rigidly applied by *Montejo* and strongly advocated by the government is "not a hard fast rule, but rather an aid to discovery of  intent that applies only where no contrary intention appears." *United States v. Nofziger*, 878 F.2d 442, 460 (D.C. Cir. 1989).  In this case the plain language of the Statute calls for the application of the qualifying word "knowingly" to apply not only to the immediately following  words "*transfers, possesses, or uses"* but also to the subsequent phrase, "*a means of identification of another person*".  This reading is consistent with the plain language under ordinary grammatical construction, "*a means of identification of another person*" being the object of the verbs "*knowingly  transfers, possesses, or uses"*.  More importantly this reading fulfills the legislative purpose to "create new criminal penalties for knowingly possessing another person's means of identification" and is consistent with the full legislative history of the act.  108 H. Rpt. 528, H. Rep. P.L. 108-275. This reading  does not result in and absurd or "odd" result of  strongly penalizing inadvertent behavior and it is consistent with the structure of the Statute.  Finally, this reading provides an appropriate level of scienter to justify a punishment under the Constitution. *United States v. X-citement Video, Inc.,* 513 U.S. 64, 79, 115 S. Ct. 464, 130 L. Ed. 2d 372 *(1994).*

The Supreme Court's ruling in *Arthur Andersen v. United States*, is helpful in stating that "knowingly" is "usually associated with awareness, or consciousness."  __ U.S. __, 125 S. Ct. 2129 (2005). Limiting the mandatory enhanced penalty to those  conscious of the fact that the identification in question is that of another person  sensibly allows  18 USC 1028A to reach only those targeted by the legislature, identity thieves and/or those conscious of the identity theft.

---

[2] Even the district judge in *Montejo* recognized that "it is odd- and borders on the absurd to call what Montejo did "theft"… …"it is unquestionably odd that a person who did not know that he was using a means of identification of another, whose conduct had not a single victim…would have to go to jail for two years." *Montejo,* p. 653- 655.

**C.**    *United States v. Beachem* **Provides A More Well Reasoned Interpretation of 18 USC 1028A Consistent with its Language, Title, Purpose and Legislative Intent.**

The more well reasoned interpretation of 18 USC 1028A is found in the Western District of Washington's *United States v. Beachem,* 399 F.Supp.2d. 1156 (W.D. WA. 2005).    The Washington District Court held:

> "that in order to justify the additional two years' imprisonment for Defendant that the United States is seeking under the statute, the United States must provide proof that Ms. Beachem had knowledge that the identification she used belonged to another person. In reaching this decision, this Court was also persuaded by the facts that the title of 18 U.S.C. § 1028A is "Aggravated Identity Theft" and that the legislative history of the statute speaks directly about, "provid[ing] enhanced penalties for persons who *steal* identities. . ." H.R. Rep. 108-528 at 3, 2004 (emphasis added). As the Montejo court noted, an intent to deprive another person of property is traditionally an element of the crime of theft. *Montejo,* 353 F. Supp. 2d at 654**.** This Court sees no reason not to read this traditional *mens rea* requirement into a statute meant to prevent stealing.
>
> The Court finds that "knowingly" applies to "another person" as both terms are used in 18 U.S.C. § 1028A  (a)(1) and requires a finding that the Defendant knew that the identification in question belonged to another actual person at the time she committed the offense in order to establish the requisite *mens rea* under the statute." *United States v. Beachem,* 399 F.Supp.2d. 1156, 1158 (W.D. WA. 2005).

Wherefore, for the above reasons, and  those more fully raised at a hearing on this motion,  defendants respectfully reques that the Court rule accordingly and that Counts V,VI, VII, and VIII of the Superseding Indictment herein be dismissed.

                                                                    Respectfully Submitted,


                                                                    _____/s/_____
                                                                    Joanne Roney Hepworth
                                                                    601 Pennsylvania Avenue,
                                                                    Suite 900, South Building
                                                                    Washington, DC  20004
                                                                    (202)789-0037
                                                                    Attorney for David Mora-Gil


                                    CERTIFICATE OF SERVICE

I, hereby, certify that a copy of the foregoing was, served electronically, on this

11

___17th_____day of __March___, 2006, on all parties.


_____/s/_____
Joanne Roney Hepworth